UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

# SEALED

UNITED STATES OF AMERICA

v.

MICHAEL ERNEST ZAPETIS, SR.,
KAREN CARAZO ZAPETIS,
  a/k/a "Karen Lois Gimbrone Carazo",
  a/k/a "Karen Lois Carazo",
  a/k/a "Karen Zapetis",
  a/k/a "Karen Leicht",
RICHARD JOSEPH SOLOMON,
WILLIAM ALLEN BROUGHTON,
  a/k/a "W. Allen Broughton",
  a/k/a "Allen Broughton",
CLIFTON FRED LEES,
  a/k/a "Cliff Lees",
WILLIAM L. CLANCY,
  a/k/a "Bill Clancy",
JOHN E. S. KRAMAR,
  a/k/a "Jes Kramar",
PETER IVAN GREENGRASS,
RICHARD WILLIAM PETERSON,
  a/k/a "Richard Snyder",
  a/k/a "Dick Snyder",
  a/k/a "Bob James", and
ANTHONY JOHN HICKS

CASE NO. 8:06-CR-002ᵉᵗ-21ᵗ-TBM
18 U.S.C. § 371
18 U.S.C. § 1956
18 U.S.C. § 981 (Forfeiture)
28 U.S.C. § 2461(c) (Forfeiture)
18 U.S.C. § 982 (Forfeiture)

## INDICTMENT

The Grand Jury charges:

## COUNT ONE

### (Conspiracy to Commit Mail Fraud, Wire Fraud, and Insurance Fraud)

#### Introduction

At times material to this Indictment:

1.     An insurance company was required to be licensed in order to do insurance business in the United States and in most other locations worldwide.

2.      An insurance company was required to have sufficient capital or liquid assets, known as "statutory capital", so that claims made by policyholders could be paid in a timely manner.

**A.      The Individuals**

3.      MICHAEL ERNEST ZAPETIS, SR., was Chairman of FIRST INTERNATIONAL FINANCE CORPORATION, President of INTER DEVELOPMENT CORPORATION, and Director of FLORIDA MARINE TERMINAL.  MICHAEL ERNEST ZAPETIS, SR., was married to KAREN CARAZO ZAPETIS.  Together with his wife, MICHAEL ERNEST ZAPETIS, SR., directed the fraud scheme.  Through the use of offshore entities and individuals, MICHAEL ERNEST ZAPETIS, SR., sold sham offshore insurance companies and subsidiary companies, rented bogus assets, procured fraudulent financial statements and unqualified audit opinions, issued various types of worthless insurance, and collected premium payments for such insurance.

4.      KAREN CARAZO ZAPETIS, a/k/a "Karen Lois Gimbrone Carazo", a/k/a "Karen Lois Carazo", a/k/a "Karen Zapetis", a/k/a "Karen Leicht", was President, Vice President and Bonding Consultant of FIRST INTERNATIONAL FINANCE CORPORATION, an owner of CONSORCIO DE SEGUROS POLARIS, S.A., and Vice President of INTER DEVELOPMENT CORPORATION.  KAREN CARAZO ZAPETIS was married to MICHAEL ERNEST ZAPETIS, SR.  Together with her husband, KAREN CARAZO ZAPETIS operated the fraud scheme.  Through the use of offshore entities and individuals, KAREN CARAZO ZAPETIS sold sham offshore insurance companies and subsidiary companies, rented bogus assets, procured fraudulent financial

2

statements and unqualified audit opinions, issued various types of worthless insurance, and collected premium payments for such insurance.

5.      RICHARD JOSEPH SOLOMON was the President of MALIK INTERNATIONAL, INC., a/k/a "MALIK INTERNATIONAL, S.A.", and Executive Director of the purported International Trust Division of the COOPERATIVA DE AHORRO Y CREDITO GATUN, R.L.  SOLOMON made bogus certificates of deposit available to others, in exchange for "asset rental fees".  SOLOMON also caused the preparation of documents, designed to conceal the fraudulent and worthless nature of the certificates of deposit.

6.      WILLIAM ALLEN BROUGHTON, a/k/a "W. Allen Broughton", a/k/a "Allen Broughton", was the Managing Director of SYNERGY CAPITAL MANAGEMENT, LLC., and participated in the operation and management of FINANCIAL CAPITAL COMPANY OF AMERICA, LLC.  BROUGHTON directed and controlled the issuance of fraudulent financial guarantee bonds and other forms of credit enhancement, offered bogus assets for rent and, with MICHAEL ERNEST ZAPETIS, SR., formed a "consortium" of over thirty sham insurance companies.

7.      CLIFTON FRED LEES, a/k/a "Cliff Lees", was a Director of GLOBAL INSURANCE COMPANY, LTD., and a Director of STAR INSURANCE COMPANY, LTD.  LEES facilitated the sale of a sham offshore insurance company and subsidiary company and the rental of bogus assets to fraudulently capitalize the companies, helped operate said companies, and participated in the procurement and payment of fraudulent reinsurance.

3

8.     WILLIAM L. CLANCY, a/k/a "Bill Clancy", was a member of CLANCY &
COMPANY, P.L.L.C., an accounting firm in Phoenix, Arizona.  CLANCY was a certified
public accountant licensed in Arizona and Kentucky.  CLANCY prepared false and
fraudulent financial statements and an unqualified audit opinion for FINANCIAL
CAPITAL COMPANY OF AMERICA, and agreed to prepare false and fraudulent
financial statements and an unqualified audit opinion for CONTINENTAL INDEMNITY,
LTD.

9.     JOHN E. S. KRAMAR, a/k/a "Jes Kramar", was an attorney licensed and
practicing in Texas.  KRAMAR acted as the Vice President and General Counsel of
STAR INSURANCE COMPANY, LTD.  KRAMAR participated in negotiations for the
purchase of a sham offshore insurance company, facilitated an agreement for the rental
of bogus assets, worked with a certified public accountant to secure false and
fraudulent financial statements for a sham offshore insurance company, and accepted
and transferred funds using his attorney trust account to further the fraud.

10.     PETER IVAN GREENGRASS was a principal of GC INSURANCE
BROKERS, LTD., a brokerage firm located in Norwich, England, United Kingdom.
GREENGRASS marketed and sold worthless insurance policies for a sham offshore
insurance company, and forwarded premiums paid for such policies to a co-conspirator.

11.     RICHARD WILLIAM PETERSON actively participated in the marketing
and operations of a sham offshore insurance company, using aliases of "Richard
Snyder", "Dick Snyder", and "Bob James".

4

12.    ANTHONY JOHN HICKS was the President of WORLDWIDE INSURANCE CONSULTING, INC.  HICKS assisted in the establishment of a sham offshore insurance company.

**B.    The Entities**

13.    AMERICAN INDEMNITY COMPANY, LTD. [hereinafter "AIC"] was a sham insurance company that issued worthless insurance policies.  AIC had no statutory capital, and conspirators named herein falsely and fraudulently inflated AIC's consolidated financial statements to make it appear that AIC had the ability to pay claims submitted to it on the insurance policies AIC issued internationally.  AIC was created, owned and controlled by MICHAEL ERNEST ZAPETIS, SR., and KAREN CARAZO ZAPETIS.  AIC was a St. Christopher and Nevis corporation, with its main office in San Jose, Costa Rica, and a management/administrative office in Florida.  AIC was not licensed to do insurance business in the United States or any other domicile.

14.    STAR INSURANCE COMPANY, LTD. [hereinafter "STAR"] was a sham insurance company that issued worthless insurance policies and reinsurance policies, including reinsurance for phony financial guarantee bonds issued by GLOBAL INSURANCE COMPANY, LTD.  STAR had no statutory capital, and conspirators named herein falsely and fraudulently inflated STAR's consolidated financial statements to make it appear that STAR had the ability to pay claims submitted to it on the insurance and reinsurance policies STAR issued both in the United States and internationally.  STAR was created, owned and controlled by MICHAEL ERNEST ZAPETIS, SR., and KAREN CARAZO ZAPETIS.  JOHN E. S. KRAMAR acted as the Vice President and General Counsel for STAR.  STAR was a St. Christopher and Nevis

corporation, with its office in San Jose, Costa Rica.  STAR was not licensed to do insurance business in the United States or any other domicile.

15.    GLOBAL INSURANCE COMPANY, LTD. [hereinafter "GLOBAL"] was a sham insurance company that issued phony financial guarantee bonds to guarantee repayment of promissory notes.  GLOBAL had no statutory capital, and conspirators named herein falsely and fraudulently inflated GLOBAL's consolidated financial statements to make it appear that GLOBAL had the ability to pay claims submitted to it on financial guarantee bonds issued by GLOBAL.  GLOBAL was created by MICHAEL ERNEST ZAPETIS, SR., and KAREN CARAZO ZAPETIS, and was subsequently sold to WORLD VISION ENTERTAINMENT, INC., and was ultimately controlled, directed, and operated, in whole and in part, by CLIFTON FRED LEES.  GLOBAL was a St. Christopher and Nevis corporation, with its corporate address in San Jose, Costa Rica. GLOBAL was not licensed to do insurance business in the United States or any other domicile.

16.    WORLD VISION ENTERTAINMENT, INC. [hereinafter "WORLD VISION"], a Florida corporation, was engaged in the business of marketing, offering, and issuing fraudulent promissory notes to investors in Florida and throughout the United States.  Conspirators falsely represented that the promissory notes were insured by financial guarantee bonds issued by GLOBAL.  However, conspirators knew that the GLOBAL financial guarantee bonds were phony and worthless.

17.    SYNERGY CAPITAL MANAGEMENT, LLC [hereinafter "SYNERGY"] was a registered Delaware limited liability company, which operated in Jackson, Mississippi, and Atlanta, Georgia.  SYNERGY owned 100 percent of the stock and was the holding

6

company of FINANCIAL CAPITAL COMPANY OF AMERICA, LLC.  SYNERGY marketed the worthless financial guarantee bonds and other fraudulent forms of credit enhancement issued by FINANCIAL CAPITAL COMPANY OF AMERICA, LLC.

18.     FINANCIAL CAPITAL COMPANY OF AMERICA, LLC [hereinafter "FCCA"] issued false and fraudulent financial guarantee bonds and other forms of credit enhancement for commercial projects.  FCCA was a registered Nevada limited liability company, also registered and operating in Atlanta, Georgia, and was 100 percent owned by SYNERGY.  FCCA was not licensed to do insurance business in the United States or any other domicile.

19.     PREMIER HOLIDAYS INTERNATIONAL, INC. [hereinafter "PREMIER HOLIDAYS"] was a Florida corporation, operating in Tampa, Florida, and Atlanta, Georgia.  PREMIER HOLIDAYS was engaged in the business of marketing, offering, and issuing fraudulent promissory notes to investors in Florida and throughout the United States.  Conspirators falsely represented that the promissory notes were insured by financial guarantee bonds issued by FCCA.  However, conspirators knew that the FCCA financial guarantee bonds were phony and worthless.

20.     CONTINENTAL INDEMNITY, LTD. [hereinafter "CI LTD."] was a Barbados company formed as part of an undercover criminal investigation conducted by the Internal Revenue Service.  CI LTD. was established by conspirators to facilitate the illegal business of issuing fraudulent insurance and sending the proceeds of illegal activity offshore.  CI LTD. was not licensed to do business in the United States or any other domicile.

7

21.    WORLDWIDE INSURANCE CONSULTANTS, INC., a Tennessee company, assisted in establishing CI LTD., a sham offshore insurance company.

22.    COOPERATIVA DE AHORRO Y CREDITO GATUN, R.L. [hereinafter "COOPERATIVA GATUN"], a Panamanian credit union, issued worthless certificates of deposit through its purported International Trust Division upon the instruction of RICHARD JOSEPH SOLOMON.  Conspirators falsely and fraudulently represented that these worthless certificates of deposit constituted statutory capital available to the various sham insurance companies to pay any and all claims, when, in fact, the insurance companies had no statutory capital or other assets to pay such claims.

23.    MALIK INTERNATIONAL, INC., an Ohio corporation, and MALIK INTERNATIONAL, S.A., a Panamanian company,  [hereinafter "MALIK"] were engaged in the business of obtaining worthless certificates of deposit from the COOPERATIVA GATUN's purported International Trust Division and, for a fee, placing said certificates of deposit with investors for credit enhancement purposes.

24.    CAPITALES UNO DE AMERICA, S.A., CAPITALES TRES DE AMERICA, S.A., CAPITALES SEIS DE AMERICA, S.A., CAPITALES NUEVE DE AMERICA, S.A., and INVERSIONES SOLIDARIAS AMERICANIS, S.A. were all registered Costa Rica companies that were created and caused to be created by conspirators as wholly-owned subsidiaries of the various sham insurance companies.  These subsidiary companies owned no statutory capital.  Conspirators assigned worthless certificates of deposit to these wholly-owned subsidiaries.  In so doing, conspirators disguised the true ownership of the worthless certificates of deposit.

8

25.     BANCO NACIONAL DE COSTA RICA [hereinafter "BANCO NACIONAL"], a Costa Rican financial institution, with an office in San Jose, Costa Rica, maintained custody of worthless certificates of deposit, purportedly totaling millions of dollars.

26.     CONSORCIO DE SEGUROS POLARIS, S.A., (later known as CONSORCIO DE SEGUROS DEL CARIBE, S.A.) [hereinafter "CONSORCIO"], a registered Costa Rica company, with its office in San Jose, Costa Rica, was controlled by MICHAEL ERNEST ZAPETIS, SR., and KAREN CARAZO ZAPETIS.  CONSORCIO provided offshore administrative services to the various sham insurance companies owned and controlled by conspirators named herein.  CONSORCIO was the 100 percent shareholder of STAR INSURANCE COMPANY, LTD.

27.     FIRST INTERNATIONAL FINANCE CORPORATION [hereinafter "FIFC"], INTER DEVELOPMENT CORPORATION [hereinafter "IDC"], and FLORIDA MARINE TERMINAL, INC. [hereinafter "FMT"] were companies owned and controlled by MICHAEL ERNEST ZAPETIS, SR., and KAREN CARAZO ZAPETIS, and which were used by the ZAPETISES to provide instructions to co-conspirators regarding the operation of sham offshore insurance companies and the marketing of worthless insurance products, and to illegally conceal, launder, and distribute proceeds of fraudulent activity to conspirators.

## The Conspiracy

28.    Beginning on an unknown date, but at least as early as March 1993, and

continuing thereafter, through and including at least April 2001, within the Middle District

of Florida, and elsewhere,

> MICHAEL ERNEST ZAPETIS, SR.,
> KAREN CARAZO ZAPETIS,
> a/k/a "Karen Lois Gimbrone Carazo",
> a/k/a "Karen Lois Carazo",
> a/k/a "Karen Zapetis",
> a/k/a "Karen Leicht",
> RICHARD JOSEPH SOLOMON,
> WILLIAM ALLEN BROUGHTON,
> a/k/a "W. Allen Broughton",
> a/k/a "Allen Broughton",
> CLIFTON FRED LEES,
> a/k/a "Cliff Lees",
> WILLIAM L. CLANCY,
> a/k/a "Bill Clancy",
> JOHN E. S. KRAMAR,
> a/k/a "Jes Kramar",
> PETER IVAN GREENGRASS,
> RICHARD WILLIAM PETERSON,
> a/k/a "Richard Snyder",
> a/k/a "Dick Snyder",
> a/k/a "Bob James", and
> ANTHONY JOHN HICKS

the defendants herein, did knowingly and willfully combine, conspire, confederate and

agree, with one another and with others, both known and unknown to the Grand Jury, to

commit certain offenses against the United States, specifically:

(a)    To devise and intend to devise a scheme and artifice to defraud

and for obtaining money and property by means of materially false and fraudulent

pretenses, representations, and promises, utilizing the United States mail and private

and commercial interstate carriers, in violation of Title 18, United States Code, Section 1341;

(b)     To devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, utilizing transmissions by means of wire and radio communication in interstate and foreign commerce of any writings, signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343; and

(c)     To knowingly make a false entry of material fact in a book, report, and statement while engaged in the business of insurance and while involved in a transaction relating to the conduct of affairs of such business with intent to deceive any person about the financial condition and solvency of such business, the activities of which business affect interstate commerce, in violation of Title 18, United States Code, Section 1033(c)(1).

### Manner and Means of the Conspiracy

29.     It was a part of the conspiracy that conspirators would and did acquire offshore companies whose names contained the word "insurance" and would and did fraudulently hold out such companies to be licensed insurance and reinsurance companies. It was also part of the conspiracy that conspirators would and did acquire offshore companies to be wholly-owned subsidiaries of the companies that they fraudulently held out to be insurance and reinsurance companies.

30.     It was further a part of the conspiracy that defendant RICHARD JOSEPH SOLOMON would and did make available for use by other conspirators worthless certificates of deposit purportedly issued by the International Trust Division of the

11

COOPERATIVA GATUN.  In return, other conspirators would and did pay an "asset rental fee" for the use of the worthless certificates of deposit.

31.    It was further a part of the conspiracy that conspirators would and did create phony documents to make it appear that the worthless certificates of deposit were statutory capital owned by the wholly-owned subsidiary companies.

32.    It was further a part of the conspiracy that conspirators would and did use the worthless certificates of deposit to falsely inflate the consolidated balance sheets of the purported insurance and reinsurance companies and make it appear that the companies had statutory capital, that is, assets with which to pay claims on insurance policies and financial guarantee bonds issued by them, when, in fact, the companies had no statutory capital or other assets available to pay such claims.

33.    It was further a part of the conspiracy that the conspirators would and did create and cause to be created false financial statements and unqualified audit opinions, claiming that the purported insurance and reinsurance companies and their wholly-owned subsidiaries had statutory capital, when, in truth, they had no statutory capital or other assets with which to pay claims against insurance policies and financial guarantee bonds.

34.    It was further a part of the conspiracy that, in return for the payment of premiums, conspirators would and did cause the purported insurance and reinsurance companies to issue worthless insurance and reinsurance policies and financial guarantee bonds.

35.    It was further a part of the conspiracy that, when policyholders submitted legitimate claims for losses covered by the terms of their insurance policies and

12

financial guarantee bonds, the conspirators would and did concoct false reasons to deny coverage and would and did refuse payment of the claims.

## Overt Acts

36.    In furtherance of the conspiracy and to effectuate the objects thereof, the following overt acts, among others, were committed within the Middle District of Florida, and elsewhere:

## A.    American Indemnity Company

(1)    On or about December 15, 1995, defendant MICHAEL ERNEST ZAPETIS, SR., and defendant KAREN CARAZO ZAPETIS caused an accounting firm to issue a false and fraudulent unqualified audit opinion on the consolidated financial statements of AIC and its wholly-owned subsidiary, CAPITALES UNO.

(2)    On an unknown date, conspirators and an insurance broker executed a management agreement that pertained to the marketing of AIC that went into effect on or about February 1, 1996.

(3)    On or about April 17, 1996, defendant KAREN CARAZO ZAPETIS sent to an insurance broker a letter, to which she attached another letter from defendant RICHARD JOSEPH SOLOMON, regarding the certificates of deposit.

(4)    On or about May 10, 1996, defendant RICHARD JOSEPH SOLOMON sent via facsimile to an insurance broker, in care of defendant KAREN CARAZO ZAPETIS, a letter regarding the validity of the certificates of deposit issued by COOPERATIVA GATUN.

13

(5)     On or about July 22, 1996, defendant KAREN CARAZO ZAPETIS sent to an insurance broker a letter regarding marketing AIC and instructing that "all is fine, and I believe that all should be 'kept directly on course' with no changes to be made".

**B.     Star Insurance Company**

(6)     On or about April 2, 1996, defendant MICHAEL ERNEST ZAPETIS, SR., and defendant KAREN CARAZO ZAPETIS caused a certified public accountant in San Jose, Costa Rica, to issue a false and fraudulent unqualified audit opinion on the consolidated financial statements of STAR and its wholly-owned subsidiary, CAPITALES TRES.

(7)     On or about April 24, 1997, a co-conspirator sent to defendant MICHAEL ERNEST ZAPETIS, SR., a letter regarding the sale of STAR to the co-conspirator.

(8)     On or about April 25, 1997, defendant KAREN CARAZO ZAPETIS, in her capacity as President of FIFC, formally offered to sell STAR to a co-conspirator and directed that payments be wired to an account in the name of FIFC in Miami, Florida.

(9)     On or about April 29, 1997, a co-conspirator sent via facsimile to defendant PETER IVAN GREENGRASS a message, along with documents regarding the proposed sale of STAR and false and fraudulent financial information for use in marketing STAR.

(10)    On or about April 30, 1997, defendant JOHN E. S. KRAMAR sent via facsimile to defendant KAREN CARAZO ZAPETIS a letter regarding negotiations to purchase STAR.

14

(11)   On or about May 2, 1997, a co-conspirator caused $20,000 to be wired to the bank account of FIFC.

(12)   On or about May 12, 1997, defendant PETER IVAN GREENGRASS sent via facsimile to an insurance broker the financial statements of STAR.

(13)   On or about June 17, 1997, defendant PETER IVAN GREENGRASS caused $10,000 to be wired to a co-conspirator's personal bank account.

(14)   On or about July 11, 1997, defendant JOHN E. S. KRAMAR sent via facsimile to defendant KAREN CARAZO ZAPETIS a letter in which he stated that a co-conspirator wanted him to serve as Vice-President and General Counsel of STAR.

(15)   On or about August 27, 1997, defendant KAREN CARAZO ZAPETIS caused a referral of business to STAR.

(16)   On or about August 30, 1997, defendant JOHN E. S. KRAMAR and another co-conspirator signed "Minutes of the Board of Directors of Star Insurance Company, Ltd."

(17)   On or about September 29, 1997, a co-conspirator sent via facsimile to PETER IVAN GREENGRASS a message, along with false and fraudulent financial information for use in marketing STAR.

(18)   On or about July 3, 1998, defendant MICHAEL ERNEST ZAPETIS, SR., and defendant KAREN CARAZO ZAPETIS caused a certified public accountant in San Jose, Costa Rica, to issue another false and fraudulent unqualified audit opinion on the consolidated financial statements of STAR and its wholly-owned subsidiary, CAPITALES TRES.

15

(19)    On or about September 17, 1998, defendant RICHARD WILLIAM
PETERSON signed a false and fraudulent insurance policy issued by STAR using his
alias "Richard Snyder".

(20)    On or about October 14, 1998, defendant RICHARD WILLIAM
PETERSON mailed an insurance policy issued by STAR from the United States to an
insurance brokerage firm in the United Kingdom.

## C.    Global Insurance Company

(21)    On or about November 17, 1997, defendant MICHAEL ERNEST
ZAPETIS, SR., sent via facsimile to defendant CLIFTON FRED LEES a letter in which
he offered to sell an insurance company.

(22)    On or about February 4, 1998, defendant KAREN CARAZO ZAPETIS
sent via facsimile to defendant CLIFTON FRED LEES a letter along with an agreement
to sell stock of GLOBAL.

(23)    On or about February 24, 1998, defendant CLIFTON FRED LEES sent to
defendant MICHAEL ERNEST ZAPETIS, SR., a letter to confirm their upcoming
meeting with other co-conspirators.

(24)    On or about February 25, 1998, defendant KAREN CARAZO ZAPETIS
sent via facsimile to a co-conspirator a letter directing him to wire money to FIFC and to
defendant CLIFTON FRED LEES.

(25)    On or about April 15, 1998, defendant KAREN CARAZO ZAPETIS,
defendant CLIFTON FRED LEES, and other co-conspirators attended a meeting of the
Board of Officers and Directors of GLOBAL in San Jose, Costa Rica.

16

(26)    On or about May 4, 1998, defendant MICHAEL ERNEST ZAPETIS, SR., and defendant KAREN CARAZO ZAPETIS caused a certified public accountant in San Jose, Costa Rica, to issue a false and fraudulent unqualified audit opinion on the consolidated financial statements of GLOBAL and its wholly-owned subsidiary, CAPITALES NUEVE.

(27)    On or about the last week of September 1998, defendant KAREN CARAZO ZAPETIS traveled to St. Christopher, West Indies.

(28)    On or about December 11, 1998, defendant RICHARD JOSEPH SOLOMON executed an agreement providing for the placement of $12,150,000 of worthless certificates of deposit into the BANCO NACIONAL account of CAPITALES NUEVE in exchange for monthly asset rental payments from CAPITALES NUEVE, the subsidiary of GLOBAL.

(29)    On or about December 22, 1998, defendant KAREN CARAZO ZAPETIS caused to be sent to defendant CLIFTON FRED LEES a letter advising that an asset rental payment characterized as "dividends" was due to CONSORCIO on January 1, 1999.

(30)    On or about January 4, 1999, defendant RICHARD JOSEPH SOLOMON sent via facsimile to a co-conspirator a letter advising where to send the January asset rental payment.

**D.    Synergy Capital Management / Financial Capital Company of America**

(31)    On or about June 20, 1997, defendant WILLIAM ALLEN BROUGHTON executed an Employment Agreement with SYNERGY.

17

(32)    On or about June 20, 1997, defendant WILLIAM ALLEN BROUGHTON conducted an organizational meeting of the members of SYNERGY, which, among other things, approved the appointment of defendant WILLIAM ALLEN BROUGHTON and defendant KAREN CARAZO ZAPETIS to the Board of Managers of SYNERGY.

(33)    From at least in or about July 1997, to at least in or about May 1998, defendant WILLIAM ALLEN BROUGHTON caused fraudulent FCCA financial guarantee bonds to be sent via the United States mail to, among others, victim-investors in PREMIER HOLIDAYS.

(34)    On or about January 22, 1998, defendant WILLIAM ALLEN BROUGHTON caused an advertisement to be printed in the *Wall Street Journal*.

(35)    On or about February 24, 1998, defendant WILLIAM L. CLANCY issued a false and fraudulent unqualified audit opinion on the financial statements of FCCA.

(36)    From at least on or about September 27, 2000, to at least on or about March 13, 2001, defendant WILLIAM ALLEN BROUGHTON, in his capacity as Managing Director of SYNERGY, caused lulling letters to be sent to victim-investors.

## E.    Continental Indemnity

(37)    On or about April 18, 1997, defendant ANTHONY JOHN HICKS met with undercover agents of the Internal Revenue Service in Dallas, Texas, regarding the establishment of an offshore insurance company.

(38)    On or about May 13, 1997, defendant ANTHONY JOHN HICKS spoke with an undercover agent about forming and licensing an offshore insurance company.

18

(39)    On or about May 30, 1997, defendant ANTHONY JOHN HICKS met with undercover agents regarding the establishment and funding of an offshore insurance company.

(40)    On or about December 18, 1997, defendant ANTHONY JOHN HICKS introduced an undercover agent to a co-conspirator for the purpose of obtaining rented assets to fraudulently capitalize the offshore insurance company.

(41)    On or about January 22, 1998, defendant ANTHONY JOHN HICKS and a co-conspirator met with undercover agents in Atlanta, Georgia, to discuss disguising and falsely inflating the assets of the offshore insurance company.

(42)    On or about March 4, 1998, a co-conspirator introduced undercover agents to defendant WILLIAM ALLEN BROUGHTON at a meeting in Atlanta, Georgia, for the purpose of discussing options for renting assets to fraudulently capitalize the offshore insurance company.

(43)    On or about May 5, 1998, defendant WILLIAM L. CLANCY met with undercover agents at the office of CLANCY & COMPANY in Phoenix, Arizona, and defendant CLANCY agreed to prepare an unqualified audit opinion of the financial statements of the offshore insurance company.

(44)    On or about June 3, 1998, defendant WILLIAM L. CLANCY sent via facsimile to undercover agents documents pertaining to SYNERGY, FCCA, and INVERSIONES.

(45)    On or about June 9, 1998, defendant MICHAEL ERNEST ZAPETIS, SR., sent via facsimile to an undercover agent a letter regarding the rental of assets.

19

(46)    On or about June 12, 1998, defendant JOHN E. S. KRAMAR participated in a telephone conversation with an undercover agent regarding the rental of assets and obtaining an unqualified audit opinion for the offshore insurance company.

(47)    On or about June 16, 1998, defendant MICHAEL ERNEST ZAPETIS, SR., met with undercover agents in Miami, Florida, to discuss the rental of assets and the avoidance of paying taxes in the United States.

(48)    On or about August 25, 1998, defendant JOHN E. S. KRAMAR met with an undercover agent in his law office in Houston, Texas, and the undercover agent signed an agreement pertaining to the rental of assets that were to be fraudulently placed on the balance sheet of the offshore insurance company.

(49)    On or about August 27, 1998, defendant JOHN E. S. KRAMAR caused an undercover agent to wire $45,040 to defendant JOHN E. S. KRAMAR's trust account.

(50)    On or about October 21, 1998, defendant JOHN E. S. KRAMAR sent to defendant WILLIAM L. CLANCY a letter confirming receipt of $45,040 from undercover agents.

(51)    On or about October 29, 1998, a co-conspirator sent via facsimile to undercover agents a message informing the agents that their offshore insurance company had been incorporated in Barbados, West Indies, under the name "CONTINENTAL INDEMNITY, LTD."

(52)    On or about November 13, 1998, defendant MICHAEL ERNEST ZAPETIS, SR., participated in a telephone conversation with an undercover agent during which they discussed an asset rental payment.

20

(53)    On or about January 6, 1999, defendant RICHARD WILLIAM PETERSON participated in a telephone call with an undercover agent during which he agreed to maintain business records for CI LTD.

(54)    On or about January 13, 1999, pursuant to instructions received from defendant ANTHONY JOHN HICKS, an undercover agent sent a package regarding the purchase of a phony Directors and Officer's insurance policy to defendant ANTHONY JOHN HICKS.

(55)    On or about February 15, 1999, defendant JOHN E. S. KRAMAR sent to undercover agents an invoice regarding an asset rental payment due on February 25, 1999.

(56)    On or about February 17, 1999, defendant WILLIAM L. CLANCY participated in a telephone call with undercover agents regarding his preparation of an unqualified audit opinion for CI LTD.

(57)    On or about February 24, 1999, defendant ANTHONY JOHN HICKS sent via facsimile to undercover agents a phony $3,000,000.00 insurance policy.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### (Money Laundering Conspiracy)

### Introduction

1.    The Grand Jury realleges Paragraphs 1 through 27 of Count One of this Indictment and incorporates such paragraphs by this reference as though fully set forth herein.

## The Conspiracy

2.     Beginning on an unknown date, but at least as early as March 1993 and

continuing thereafter, through and including in or about August 2000, within the Middle

District of Florida, and elsewhere,

MICHAEL ERNEST ZAPETIS, SR.,
KAREN CARAZO ZAPETIS,
a/k/a "Karen Lois Gimbrone Carazo",
a/k/a "Karen Lois Carazo",
a/k/a "Karen Zapetis",
a/k/a "Karen Leicht",
RICHARD JOSEPH SOLOMON,
WILLIAM ALLEN BROUGHTON,
a/k/a "W. Allen Broughton",
a/k/a "Allen Broughton",
CLIFTON FRED LEES,
a/k/a "Cliff Lees",
WILLIAM L. CLANCY,
a/k/a "Bill Clancy",
JOHN E. S. KRAMAR,
a/k/a "Jes Kramar",
PETER IVAN GREENGRASS,
RICHARD WILLIAM PETERSON,
a/k/a "Richard Snyder",
a/k/a "Dick Snyder",
a/k/a "Bob James" and
ANTHONY JOHN HICKS,

the defendants herein, did knowingly and willfully combine, conspire, confederate and

agree with one another and with others, both known and unknown to the Grand Jury, to

commit certain offenses against the United States, specifically:

(a)     to transport, transmit, and transfer, and to attempt to transport,

transmit, and transfer funds from a place in the United States to and through a place

outside the United States and to a place in the United States from and through a place

outside the United States, with the intent to promote the carrying on of a specified

22

unlawful activity, that is, mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), in violation of Title 18, United States Code, Section 1956(a)(2)(A);

(b)    to transport, transmit, and transfer, and to attempt to transport, transmit, and transfer funds from a place in the United States to and through a place outside the United States and to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, that is, mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), in violation of Title 18, United States Code, Section 1956(a)(2)(B)(I); and

(c)    to knowingly engage and attempt to engage in monetary transactions within the United States, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C, § 1343), in violation of Title 18, United States Code, Section 1957.

## Manner and Means of Money Laundering Conspiracy

The manner and means by which the conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

3.    The Grand Jury realleges Paragraphs 29 through 35 of Count One of this Indictment and incorporates such paragraphs by this reference as though fully set forth herein.

23

4.      It was further a part of the conspiracy that one or more of the conspirators would and did cause bank accounts to be opened inside and outside of the United States.

5.      It was further a part of the conspiracy that conspirators would and did transfer and transmit funds from accounts inside and outside the United States to accounts inside and outside the United States via wire transmissions, checks, and other means.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURES

1.      The allegations contained in Counts One and Count Two of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(1).

2.      From their engagement in any and all violations alleged in Count One of this Indictment, related to the conspiracy to commit mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 371, the defendants,

MICHAEL ERNEST ZAPETIS, SR.,
KAREN CARAZO ZAPETIS,
a/k/a "Karen Lois Gimbrone Carazo",
a/k/a "Karen Lois Carazo",
a/k/a "Karen Zapetis",
a/k/a "Karen Leicht",
RICHARD JOSEPH SOLOMON,

24

WILLIAM ALLEN BROUGHTON,
a/k/a "W. Allen Broughton",
a/k/a "Allen Broughton",
CLIFTON FRED LEES,
a/k/a "Cliff Lees",
WILLIAM L. CLANCY,
a/k/a "Bill Clancy",
JOHN E.S. KRAMAR,
a/k/a "Jes Kramar",
PETER IVAN GREENGRASS,
RICHARD WILLIAM PETERSON,
a/k/a "Richard Snyder",
a/k/a "Dick Snyder",
a/k/a "Bob James" and
ANTHONY JOHN HICKS

shall forfeit to the United States of America, pursuant to Title 18, United States Code,

Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property

real or personal, which constitutes or is derived from proceeds traceable to such

offense.

3.     From their engagement in any and all violations alleged in Count Two of

this Indictment, related to the conspiracy to commit money laundering, pursuant to Title

18, United States Code, Section 1956(h), the defendants,

MICHAEL ERNEST ZAPETIS, SR.,
KAREN CARAZO ZAPETIS,
a/k/a "Karen Lois Gimbrone Carazo",
a/k/a "Karen Lois Carazo",
a/k/a "Karen Zapetis",
a/k/a "Karen Leicht",
RICHARD JOSEPH SOLOMON,
WILLIAM ALLEN BROUGHTON,
a/k/a "W. Allen Broughton",
a/k/a "Allen Broughton",
CLIFTON FRED LEES,
a/k/a "Cliff Lees",
WILLIAM L. CLANCY,
a/k/a "Bill Clancy",
JOHN E.S. KRAMAR,

25

a/k/a "Jes Kramar",
PETER IVAN GREENGRASS,
RICHARD WILLIAM PETERSON,
a/k/a "Richard Snyder",
a/k/a "Dick Snyder",
a/k/a "Bob James" and
ANTHONY JOHN HICKS

shall forfeit to the United States of America, pursuant to Title 18, United States Code,

Section 982(a)(1), any property, real or personal, involved in such offense, or any

property traceable to such property.

4.     Specifically, the United States seeks the forfeiture of, including, but not

limited to, the following:

a.     Real property located at 1717 North Bayshore Drive, No. A-2856, Miami, Florida, including all improvements thereon and appurtenances thereto, the legal description of which is as follows:

Condominium Unit No. A-2856, THE GRAND, A CONDOMINIUM, according to the Declaration of Condominium thereof, as recorded in Official Records Book 12917, Page 280, Public Records of Dade County, Florida commonly know as 1717 North Bayshore Drive #A-2856, Miami, Florida 33132.

Folio No. 01-3231-048-0773.

b.     A money judgment in the amount of $ 71,176,998.63 in United States currency, representing the amount of proceeds obtained as a result of the offense charged in Count One, for which the defendants are jointly and severally liable.

5.     If any of the property described above, as a result of any act or omission

of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

26

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and, Title 18, United States Code, Section 982(b)(1).

A TRUE BILL,

Shri Wright
Foreperson

PAUL I. PEREZ
United States Attorney

By:              
Rachelle DesVaux Bedke
Assistant United States Attorney

By:              
Robert T. Monk
Assistant United States Attorney
Deputy Chief, General Crimes Section